We'll turn now to Doe v. J.P. Morgan Chase. Good morning. Hold on one second. Let the courtroom clear out. How are the appellees dividing their time? Okay. One and three. We have some soccer fans exiting the courtroom. Okay. Go ahead. May it please the Court. My name is John Thornton. I'm here with Seth Miles. And we represent John Doe, who holds a judgment against a terrorist organization, the FARC, for heinous crimes committed against him. We're seeking to collect on that judgment pursuant to TRIA, the Terrorism Risk Insurance Act, which mandates that, quote, including the blocked assets of any agency or instrumentality of that terrorist party shall be subject to execution or attachment in the aid of execution in order to satisfy such judgment. This mandate is notwithstanding any other provision of law. Given this clear mandate, we identify blocked funds that were the result of wire transfers originated by agencies or instrumentalities of the FARC, and we've attached and moved for turnover of those assets, but were denied on the grounds that this Court's decisions in Calderón-Cardona and Haussler precluded execution. Those two cases held that state law is looked to and not preempted on the question of who owns the blocked assets. And we do not challenge that aspect of those holdings. What we are appealing is the district court's holding that Calderón-Cardona and Haussler mandated it to find that the transmitting banks are the owners of the assets under the facts of this case in which the transmitting banks specifically disclaimed any interest in the funds. And we submit that the Court's decision was erroneous for two reasons. First, different facts yield different results. The question is not who owned the assets under the facts of Calderón-Cardona, but who owns them under the distinct facts presented here. It simply makes no sense to find the blocked funds belong to the only two parties on the planet that specifically swear that they do not. The stipulations are effective under state law and preclude a contrary finding. And indeed, in two post-Calderón-Haussler cases, Gates and Vera, which we cited extensively, the Court specifically analyzed the impact of those two cases on situations where the transmitting banks had either waived or disclaimed interest in the blocked accounts, and they held that they did not prevent collection of blocked transfers originated by blocked entities. We believe that the only way to avoid the impact of these controlling stipulations is to argue, as the government has, that these simple statements of non-ownership are themselves prohibited transfers. We believe that is wrong for three reasons. First, saying, these are not my funds, is not a transfer. The stipulations are premised upon the pre-existing fact that the banks do not own the assets. Isn't there an analytical distinction between the statement I disclaim interest in this piece of property and as a legal matter, I don't own it? Your Honor, I would point you to the link Is there anything that, put it slightly differently, that prevents me from disclaiming an interest in property that, as a legal matter, I own? I inherited a car from my deceased brother. I'm not going to register it. I'm not going to pick it up. I don't want it. Perhaps you could disclaim property that way, but what's happening here, Your Honor, is that if you look at the language of the record at A134, the Credit Suisse stipulation, they state in the whereas preamble, whereas Credit Suisse, however, disclaims an interest of any kind in the blocked account, and then they're accordingly prepared to enter into the stipulation relinquishing any claims in this matter. And so what follows the preamble Credit Suisse doesn't say that it ever had an interest. It's saying we're disclaiming whatever interest we might have had, if any. Your Honor, what they're saying at the moment that they they're not denying that they ever had an interest. What they're saying is, whereas we have no interest. So at that moment in time, they thought they did not have an interest. And this leads to my second point. The reason they didn't have an interest is because the the by the time they made the stipulations, the property rights that had been created by the UCC had expired. Now, transmitting banks, they merely administer wire transfers. They don't have equitable interest in the funds. They have a property right that's based on the possibility of recall or a claim under the UCC, and that is what this Court recognized in Calderon-Cardona. But as Calderon-Cardona also recognized, the property right vests in the intermediate banks only, quote, briefly. And that's in Calderon at page 1001. Now, how brief? And you look to the UCC to figure out how brief that is. And the UCC provides one year for originators to challenge a wire transfer. After that, there's no chance that these banks will be subject to a recall order that would force them to refund the funds they'd received. And that's the only instance that they would need to get the funds back per the UCC, and they no longer have that property interest that was created by the UCC. And so they enter into these stipulations without any consideration. The UCC provides clarity and finality to wire transfers. The one-year statute of repose is crucial to that fact, and we cited the case of Regattos v. Northwark Bank for that proposition. And by the way, because the funds do not in fact belong to Credit Suisse in this situation, there's no harm that's going to come to Credit Suisse from the result that we seek here, and there's no chance that a judgment against a terrorist party is going to be paid by anyone other than that terrorist party. Now, the third reason these stipulations are not prohibited transfers is that even if these were the transmitting bank's funds, and they were not, they would not be prohibited transfers because the blocking statute, Section 594.201, states that it is property and interest in property of the following persons that cannot be transferred. And the following persons are defined in Sections 81 to 5 as the specially designated nationals. The stipulations are between Credit Suisse and J.P. Morgan. They say, one, Credit Suisse says, we have no interest. And then it says, two, therefore, we won't sue you if you turn them over to John Doe. This is clearly not a transfer of a blocked entity's interest. Because even if these assets belong to Credit Suisse at that moment, Credit Suisse is not a terrorist entity. Now, we believe that there's evidence in the case that in the record that shows that the banks and the government actually agree with us. First, the government is not prosecuting J.P. Morgan Chase Bank, Credit Suisse, or the lawyers involved in drafting these stipulations. And the lawyers obviously had no fear of prosecution because they entered into written stipulations that they never would have if they would have thought these were forbidden transfers that would subject them to 20 years in prison for drafting. And second, the government filed a verified forfeiture action in U.S. District Court for the District of Columbia seeking to forfeit the Deutsche Bank blocked funds at issue in this case. The government argues in this case that the blocked funds belong solely to the transmitting bank, that innocent party. But in that case, it's trying to forfeit the funds. And reference to that case is in Deutsche Bank's brief, D63 at page 9, and its answer at appendix 289 to 90 and 295. If those funds are the sole property of the transmitting bank, the government would not have filed a verified complaint to forfeit it. We submit that the government's position perverts the express mandate and purpose of TRIA, and it shouldn't be allowed to take contrary positions to achieve this result. Obviously, the court felt constrained from considering the distinct facts of this case. In light of the stipulations, the court should have looked to other aspects of New York law to determine who has property rights in the blocked funds. And we cited to the court the cases of Shear Bonnet v. American Express and Ushinma v. Merrill Lynch, which stand for the proposition that other sources of law, and not just the UCC, should be looked to to determine the ownership of wired funds. So the UCC isn't the only thing that the District Court could have looked to. The District Court thought that was the only thing it looked to, but there's other Second Circuit precedent that says you can, in some situations, look to equity, look to abandoned property law, something else in New York law to try to determine who owns these assets. And we submit that that's appropriate in this situation where we have these stipulations that, according to New York law, according to procedure, cannot be avoided, and that's what courts did in two prior settings. Now, we believe that this Court did not intend to limit a district court from considering a stipulation's impact on ownership or any other relevant aspect of New York law. I'll hold off for rebuttal at this point. All right. Thank you. Thank you. We'll hear from the other side. Good morning, Your Honors. Stephen Feigenbaum on behalf of JPMorgan Chase Bank. At the outset, Your Honors, I want to express on behalf of JPMorgan Chase our sympathy for Mr. Doe and other terrorist victims, and the bank has absolutely no desire to impede Mr. Doe's enforcement efforts. But we have to follow the law. Who owns? In the bank's view, who owns the funds? The banks that transmitted the funds. This is in accordance with Hauser and Calderon. The banks that transmitted the funds to JPMorgan. And those direct transmission and those they say we don't want them. These are not our funds. They disclaim an interest in the funds.  However, that disclaimer is, does not constitute or does not serve as a, or have the effect of transferring that ownership interest back upstream to the originating banks. That's clear. Where does it go? That's my question. Given that the transferring banks have disclaimed, does the money, is it deemed abandoned property and it goes to the State of New York? Is that what will happen? Ultimately, that may well be what happens. Correct. But that's, that is the law. That is the law based on Hauser and Calderon. The difference is that what your opponent wants to do is say that by the disclaimer somehow that reinserts the original, the individual that gave the order with regard to the transfer. And your view is that that doesn't accomplish that. All it says is the banks are just disclaiming whatever interest they have in it. That's correct. There are two points. When we, first of all, when we enter into a stipulation like that with an entity like Credit Suisse or AHLI United, the purpose of that stipulation is to remove those entities as potential claimants to the account in question. Right. That's the sole purpose. The purpose is not to effectuate a transfer of that property interest back upstream. And the ---- But you don't offer to send the money back. We, no. The money stays where it is. And we're required to keep the money where it is. The regulations at issue here make very clear that no transaction, in this case the And that's not the purpose of these stipulations. The purpose is what I just articulated. But even if that were the purpose, that effect or that transfer would be null and void under Section 31 CFR 594202. And another point that the plaintiff raises is, well, that doesn't apply here because the entity in question, whether it's Credit Suisse is to the one account or AHLI is to the other account, is not an instrumentality of the FARC. Well, that's true. However, when you look at 594306, which defines what an interest here is under these circumstances, an interest is defined as, with respect to property, as any ---- as an indirect or indirect. That is not ---- that is a much broader interest than a property interest as defined by Haussler and Calderon. So that provision, that definition of interest clearly applies here to the actual instrumentalities which were the originators of these accounts. The Haussler and Calderon did not involve transferring banks that disclaimed ownership, right? That's correct. They're still controlling because you're arguing that they still control in this case? Yes. And why is that, if they didn't involve disclaimed assets? Haussler and Calderon established a very firm and straightforward test, which is that an account, a blocked asset, or a blocked wire transfer, to be more specific, is subject to execution under either TRIA Section 201 or FSIA Section 1610G only if the judgment debtor or an instrumentality thereof directly transmitted the wire transfer to the bank that blocked the wire transfer, in this case J.P. Morgan. There is nothing in those decisions that suggests that if that direct transmitting bank disclaims, subsequently disclaims an interest in the blocked funds. Functionally, isn't this equivalent? If the transferring bank takes itself out of the picture by disclaiming, aren't we left with essentially the situation that you just contemplated? Well, first of all. What would happen if this were not a terrorist organization in a situation like this? The money would go back upstream, I gather? Well, if this were not a terrorist situation, then TRIA and FSIA would not be applying here. So Haussler and Calderon would not apply. But the other. . . There's an overlay of Federal law on the state, the EFT transactions. When we first got into this EFT business, it was an admiralty law, and dealing with the fact that in the Southern District, they were filing attachments against EFTs, judgment credits were constantly, because we had had a case that said that you could attach those things, and we reversed that position. So then the question becomes, is it the property of the bank, the Calderon clears that up in the context of, at least as to these, as to terrorist entities, right? Correct. Calderon clears it up as to the FSIA, and Haussler as to TRIA. Okay. Thank you, Your Honors. Good morning, and may it please the Court. My name is Paul Sasso. I represent Commerce Bank AG. I rise this morning only briefly to reinforce the point that although Commerce Bank had not progressed quite as far as J.P. Morgan before the district court in that it had not yet filed an interpleader action or given notice to other wire transfer parties, all of the parties here agree and have stipulated below that Commerce Bank stands entirely in the same shoes as J.P. Morgan and would be bound by this Court's decision equally. And for that reason, we join in their entirety the arguments made by J.P. Morgan in their appellate briefs and quite capably made this morning by Mr. Feigenbaum, and we ask the Court to affirm. Thank you. We'll hear from the government. Peter Aronoff, U.S. Attorney's Office, Southern District of New York, for the government. The government has appeared as an amicus in this case to ensure that its sanctions regulations are properly interpreted and enforced by the courts. The same OFAC regulations that required these EFTs to be blocked in the first place also prohibit and nullify any transfers of blocked property. For that reason, the intermediary bank's ownership interests could not, excuse me, could not be disclaimed, and similarly, the operation of State law could not be disclaimed. Sotomayor, why is a disclaimer a transfer? Well, Your Honor, the sanctions regulations define a transfer extremely broadly. It's in 31 CFR section 594.312. As a transaction, the effect of which is to, when I'm allotting here, surrender or alter directly or indirectly any right or interest in blocked property. And so a disclaimer falls within that definition and, therefore, is a transfer that is barred once the property is blocked under section 594.201A. So under State law, which under State law, this is not the property of the terrorist entity, it's the property of the intermediary bank, right? Yes. At the moment the block occurs. Right. But for some reason, you can block it, notwithstanding the fact that under State law it's not, and I presume that there's supremacy issues there. And so then the bank says, well, okay, we don't have anything to do with it. Well, what does Federal law tell us whose property it is? So Federal law doesn't control the question of whose property it is. That's a ---- Well, Federal law certainly did with regard to the ability to block it, didn't it? Federal law ---- Federal law overruled State law as to the fact that the intermediary bank owned the property as opposed to the terrorist entity, didn't it? Well, no. With respect, in Calderon, Cardona, and Haussler, this Court held that State law controls the question of who owns the property at the moment that it's blocked. Well, I understand. Federal law then comes in and determines what may be done with the property. Well, Calderon says you can't seize it. You can't seize it because it's not the property of the FARC, right? Yes. In Calderon. Okay. But those assets weren't blocked by an OFAC order, were they? They were. Oh, they were? Yes. Calderon, Cardona ---- Was there an argument there made by the government with regard to what the implications of the blocking were? I'm not totally familiar with the precise position of the government in that case, but I know that the main point was that the funds were not the property of the terrorist entities, and so they could not be attached. Does the government concur with that analysis, that it was not the property of the terrorist entities? Yes. The government submitted amicus briefs in both of those cases. Are you telling me that the government then wouldn't seek to seize it if the government had an interest in seizing assets of terrorist entities to satisfy any obligations due to the United States? Well, Your Honor, we have not in our brief addressed that question. I do know that the ---- I think back to my involvement with 655th Avenue and the Iranian assets and the Malvi Foundation, those instances where the government at the same time was pursuing seizing assets of the Iranian government while victims of terrorist activities sought redress under the TRIA. And so I could envision a circumstance where you would be looking for assets and victims of terrorist acts would be looking for assets, and you're saying to me that you can block those assets, but that nobody has a right to claim them after they've been blocked? Well, respectfully, Your Honor, the purpose of blocking and sanctions regimes generally is in the first instance to prevent various entities, in this case we're talking about terrorists, but, you know, foreign countries in some cases from making use of the American financial system at all. The fact that these EFTs wound up passing through a United States bank is probably an accident, no terrorist. I don't know. You know, I've had three cases now with U.S. banks because people want to deal with dollars, lychee, and we have Arab Bank. So there are a lot of people who want to do transactions in U.S. dollars, a lot of people, some of them terrorist organizations, Hamas and others. So but you're saying the benefit is in the fact that it's denying them the use of it as opposed to seeking assets? Yes. So the government is satisfied with the fact that this money ends up literally in a limbo and of no use to anyone? Well, as there are the money can eventually become unblocked, and there are at least two mechanisms for that. One, it's possible for entities to be removed from the specially designated terrorist list. That's happened before. That has happened before. And also, it's also possible for OFAC to issue a license for funds to be transferred or dealt in or to generally permit a transaction. Would that remedy be available to Mr. Doe? I consulted with OFAC in this case, and they're not aware of any reason why Mr. Doe could not apply to a license for OFAC with respect to this. So Mr. Doe may have a remedy with regard to a license, which he could then seek to procure those funds? Yes. And to be clear, I'm not here to prejudge the application. No, I didn't say you could. I just said could. Can he do that if it's deemed abandoned property and it's changed to the State of New York? Well, the operation of abandoned property law is also under OFAC's reading of its own regulations. That is also barred as a transfer. But that said, OFAC. Can you mention that in your brief? Well, this was in the consequence of our footnote 2. The reason that it was in a footnote is because these issues really were not addressed in the opening brief. And so for completeness, we wanted to make sure that this was in there. In any event, OFAC does license the State of New York and other states to administer abandoned property regimes with respect to blocked funds. And there is a general license that permits the State to administer certain aspects of its blocked – sorry, of its abandoned property. TRIA is intended to block assets so that they can be available for victims of terrorism, right? And yet the government's position would seem to undermine that purpose. TRIA is designed only to, as this Court held in Haussler, only to permit attachment of a certain subset of blocked assets. It's those blocked assets that are the property of a terrorist. And there's good reason for that holding. It would be improper to compensate a terrorism victim with someone else's property other than the terrorist's own property. But the money came from the listed organizations here in the first place. It's not as if – you know, unless they got it from somewhere else. Is that the concern? So in this particular instance, I recognize that it seems that the only, you know, equitable interest in the funds at this point, absent the blocking, would be in the originating terrorist entity. But that said, TRIA is a generally applicable law. And the principle that one can only attach property that the terrorist actually owns is an important principle that applies to all other, you know, any kind of property interests, including real property, of which the terrorist might only be a partial or, you know, have some small stake in. It would be improper to permit attachment of that kind of property just because of some general interest that a terrorist entity has. Roberts. All right. Thank you. We'll hear the rebuttal. Thank you, Your Honors. Thank you, Your Honors. First, I want to address the issue of the remedy of applying for a license. The point of TRIA was to get around that process, because the government wasn't giving licenses. So Congress saw a problem and said, you can execute against these blocked assets without a license. Now, conceptually, what happened with the Court's decision, the Court did not rule that under New York law, these assets eschate to the State. The Court ruled that it was constrained from considering any other holding other than that these assets belong to the transmitting bank. Now, we think that was there because of the stipulations. We think a stipulation is valid under New York law. And the language of the stipulations in which they come forward and say — Well, it may be valid under New York law, but the question is whether there's Federal law that prevents the effect of that. Your Honor — That's what the whole — that's what the amicus is all about? Respectfully, Your Honor, the — Calderon-Cardona's holding was that to the question of ownership — I've read it a million times. The question of ownership, State law controls. And that's — the government — But there's a thing called the supremacy. The old fact, the old fact, there was no — Calderon didn't deal with the implications of a stipulation attempting to renounce the interests that Calderon recognized. Calderon was simply — well, there were a number of issues there, because North Carolina is off the list. But so — but Calderon wasn't trying to figure out the wrinkle that you have in your case, which is the waiver. Exactly, Your Honor. Calderon was decided on the facts before it. And those facts included, one, that there was no stipulation of non-ownership entered, and, two, the Court was not made aware of the fact that, in fact, this ownership right, which is based on the right to recall, had expired. And we submit that the Court should have considered that aspect, which we raised to the Court, and that the Court should have then, if it had applied New York law, it could have said, oh, this is abandoned. Does it ashame to the State? No, it's a custody State. Look, I totally get it. We've seen a lot of these. And I totally understand the attractiveness and the justice to trying to find sources for compensation for these people who have endured these kind — the wrongs that have been visited upon them. And, Congress, you're right. Congress did, with the TRIA, provide some remedies in response to what it saw as executive inaction, certain administrations. But by the same token, I also have a keen appreciation for the fact that hundreds of millions, if not billions of dollars, are wired in and out of New York on a daily basis because the world does business in dollars. And so I'm very, very reluctant to interfere with a system that's very carefully calibrated and create exceptions, which we had to undo with regard to — like we had to undo in the Admiralty cases because we were — we were mucking it up. And so one of my concerns is, is that if there's alternate remedies available to you without creating a broad rule with regard to the EFTs, that we should be very careful and cautious with regard to doing that. Your Honor, if I may submit, on the question of the — of supremacy of the Federal statute, if it is surely the supremacy of the Federal statute, TRIA says shall. But that — the line was drawn in Calderon-Cordona, and it said, on issues of process, TRIA controls, but on issues of ownership, the law of New York controls. The government would have you apply Federal law on the issue of ownership, and we believe that that's air. As far as the point — We would apply Federal law with regard to the ability to renounce ownership and its implications, not with regard to who owns it, but would say, what are the implications of renunciation? And that's — I think that's an issue of Federal law. Your Honor, it's a question of State law, whether they owned it to begin with. And if you look at the stipulations, they say, because we don't have an interest, then we will renounce. And they did that because they knew at that moment, why would you say I'm renouncing $800,000? The reason was because they knew they would never have to pay it back upstream because the one year had passed. It was something that would never have a cause to get back, Your Honor. Roberts. Thank you. We'll reserve decision. Thank you very much. All adieu. Thank you. The remaining cases are on submission. I'll ask the Clerk to adjourn. Thank you.